IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HANNAH P.,                                    )
                                              )
            Plaintiff,        ·               )
                                              )
    v.                                        )        1:16-cv-1030 (LMB/IDD)
                                              )
AVRIL HAINES, in her official capacity as     )
    Director of National Intelligence,        )
                                              )
            Defendant.                         )

<u>MEMORANDUM OPINION</u>

On August 12, 2016, after fully exhausting her administrative remedies, Hannah P.[1]

("Hannah" or "plaintiff") filed this civil action, alleging in a two count Amended Complaint:

discrimination, failure to accommodate, performance of a wrongful medical exam, and unlawful

use of confidential medical information in violation of the Rehabilitation Act, 29 U.S.C. § 794

(Count I); and interference and retaliation in violation of the Family and Medical Leave Act

(FMLA), 29 U.S.C. § 2601 (Count II). [Dkt. No. 65]. The judge originally assigned to this

action, Claude M. Hilton, granted defendant's Motion for Summary Judgment as to all claims.

[Dkt. Nos. 74, 75]. On appeal, the Fourth Circuit affirmed the district court's holding with

respect to all of plaintiff's Rehabilitation Act claims, and her claim of FMLA retaliation;

however, the grant of summary judgment on plaintiff's FMLA interference claim was reversed

after the court concluded that a "reasonable jury could find that Hannah's disclosure of her

depression and her April 9, 2015 request for psychiatrist-recommended leave was sufficient to

---

[1] Pursuant to a protective order, Hannah P. and other non-public employees of the Office of the
Director of National Intelligence are identified only by their first names and the first initial of
their last names.

trigger Appellee's responsibility to inquire further about whether Hannah was seeking FMLA leave." Hannah P. v. Coats, 916 F.3d 327, 346-7 (4th Cir. 2019).

The interference claim was remanded and, shortly thereafter, randomly reassigned to the undersigned judge, who conducted a bench trial during which nine witnesses testified. At the conclusion of the trial, the Court found that plaintiff had established by a preponderance of the evidence that the Director of National Intelligence ("Director" or "defendant") interfered with her FMLA rights; however, her claim for damages needed further development. Supplemental pleadings addressing damages have been filed, and for the reasons discussed in this Memorandum Opinion, which constitutes the Court's findings of fact and conclusions of law, plaintiff will be awarded $15,083.20 in compensatory and liquidated damages, with the amount of interest due on that judgment and the issue of her attorneys' fees to be resolved upon further briefing.

## I. FINDINGS OF FACT

From the facts stipulated by the parties, [Dkt. No. 153], and the testimony and evidence presented during the bench trial, the Court finds that the following facts have been established by a preponderance of the evidence.

Hannah has a bachelor's degree in International Politics and a master's degree in National Security from Georgetown University. [Dkt. No. 164] at 209:1-2. After receiving her master's degree, she worked for the Intelligence and National Security Alliance and as a special assistant to the Undersecretary of Defense for Intelligence, which employment included a six-month posting in Afghanistan. Id. at 209:3-23. In 2011, she was hired by the Office of the Director of National Intelligence ("ODNI") for the position of Senior Systems Analyst. [Dkt. No. 153] at ¶ 1. The position was a term-limited GS-15 position, beginning in March of 2011 and

ending on March 27, 2016. Id. Roy P., who had been plaintiff's coworker in ODNI, became her acting first-line supervisor around the beginning of 2015, and her official supervisor in February of 2015. [Dkt. No. 164] at 24:2-16.  Hannah's second-line supervisor was Art Z., the director of the Operations Analysis Group. [Dkt. No. 163] at 76:10-14. Art Z. in turn reported to Kelly G., the Deputy Assistant Director of National Intelligence for Systems and Resource Analysis. Id. at 140:17-19.

In late 2013, Hannah was selected to coordinate the Intelligence Community's response to Edward Snowden's disclosure of classified documents, which required her to coordinate the efforts of multiple agencies to carry out "taskings coming from the White House [and] from the Hill" related to Snowden's disclosures. [Dkt. No. 164] at 211:16-23. While working on the response to the Snowden disclosures, Hannah was often required to work much later hours than her co-workers, in part because the Director and other senior agency officials generally finished their regular workdays before having meetings or giving assignments related to the Snowden project. [Dkt. No. 164] at 30:2-16; id. at 213:2-9. As a result, Hannah generally arrived at work between 10:00 AM and noon, and stayed until 10:00 PM or later. Id. This schedule was consistent with her supervisors' expectations, and with the "maxiflex" schedule to which she was assigned. The "maxiflex" schedule required employees to work 80 hours within a pay period but provided flexibility as to when during the period those 80 hours were worked. Id. at 213:24-214:3. Although the response to the Snowden disclosures was originally expected to take approximately six-months, the assignment ended up lasting nearly 18 months, wrapping up in the January - February 2015 time period. [Dkt. No. 164] at 212:6-7.[2]

---

[2] There was some dispute among the witnesses about exactly when Hannah finished her work on the Snowden response. Hannah's second-line supervisor, Art Z., testified that she was transitioned off the assignment in late December 2014 or early January 2015, [Dkt. No. 163] at

In September 2011, Hannah was diagnosed with recurrent major depressive disorder. [Dkt. No. 164] at 135:9-136:5. Since her diagnosis, Hannah had been treated by a psychiatrist and a licensed clinical counselor, see id. at 135:5-10, 156:8-21, and until early 2015 she had been able to manage her symptoms; however, as her time-intensive work on the Snowden response was ending, Hannah began to experience more acute symptoms, including insomnia, which led to difficulty getting out of bed in the morning. Her symptoms made it "very difficult to function," and she struggled to arrive at the office at the same time as most of her coworkers. Id. at 138:4-9.

Although most employees in her office arrived around 9:00 AM, Hannah continued to arrive in the late morning or early afternoon, even though her work with the Snowden response no longer required her to work the same late hours that she had previously had to work. As a result, she often missed staff meetings, which occurred at 9:00 AM on Monday mornings, and was often absent when assignments were handed out, resulting in some assignments she might have been given going to other employees. [Dkt. No. 164] at 52:20-21, 53:16-22, 56:14-22. According to Hannah's second-line supervisor, Art Z., there was "an unwritten set of core hours, which was ... 9:00 to 3:00." [Dkt. No. 163] at 78:12-13. Roy P., Hannah's first-line supervisor, similarly testified that there was "the expectation" that he "could reach" his supervisees "between nine and four," [Dkt. No. 164] at 52:3-7; however, neither Art nor Roy testified that they had informed Hannah of these informal core hours. Although there was no evidence produced at trial suggesting that the quality of Hannah's work suffered during this time period, her supervisors testified that her erratic schedule was negatively affecting morale in the

---

78:14-18; however, Hannah testified that she did not fully complete her work on the assignment until February 2015. [Dkt. No. 164] at 212:6-7. This dispute is not material to the ultimate resolution of plaintiff's claim.

Operations Analysis Group, as other employees noticed Hannah's persistent lateness and the reshuffling of assignments to accommodate it. Id. at 63:13-16; [Dkt. No. 163] at 84:10-16.

By mid-March of 2015, Art Z. became sufficiently concerned about Hannah's tardiness and absences, and the administrative resources being devoted to finding her when she was unaccounted for,[3] that he asked Roy P. to put "something formal in place between he [sic] and Hannah so that there was an understanding of what her ... attendance would be going forward." [Dkt. No. 163] at 85:1-4. On March 19, 2015, Roy met with Hannah and they agreed to a procedure she would follow. Roy summarized the new protocol in an email to Art: "If Hannah is not on leave, or otherwise expected to be away from the office, she will either arrive by 10 AM or call in or email to tell us her plans. If she has not done either by 11 AM, I will call her on her cell phone until I reach her." [Dkt. No. 164] at 32:11-18; Pl. Ex. 38. Hannah testified at trial that the third component of that plan—that Roy would call her at 11 AM if he had not heard from her—was "the most important component" for her, because it "was an opportunity to break ... the negative dialogue that was going inside [her] head ... to prompt [her] to kind of snap out of [her] depressive mode." [Dkt. No. 164] at 224:18-25. Although Hannah understood the plan she and Roy developed to be "an accommodation" for her depression, there is no evidence in the record that any of her supervisors mentioned the FMLA to her while developing this schedule. Id.

Because this plan was agreed to on March 19, 2015, which was a Thursday, Hannah understood that the plan would go into effect the first Monday she was scheduled to be back in

---

[3] At trial Roy P. explained that, given the highly classified and very sensitive nature of ODNI's work, if an employee did not report for work as scheduled, management had to alert security due to the concern that employees in the intelligence field "are always targets for counterintelligence activities." [Dkt. No. 164] at 54:24-25.

the office. Id. at 225:11-17. From March 23 to 27, 2020, the first week after Hannah and her supervisors agreed to this schedule, she was on previously-scheduled leave to work on a home renovation project. Pl. Ex. 38. Although she was originally scheduled to be back in the office on Monday, March 30, she emailed her supervisors on Friday, March 27, to tell them she had to extend her leave through Monday to deal with deliveries related to the renovation. This email was timely sent under ODNI's leave policies. [Dkt. No. 154] at ¶ 16 n. 5. On Tuesday, March 31, Hannah emailed her supervisors just before noon to let them know that she would not be coming into the office that day because she was "swamped with contractor stuff." Def. Ex. 16. On Wednesday, April 1, Hannah did not arrive at work by 10:00 AM or call or email her plans to her supervisors. Instead of calling her at 11:00 AM to locate her, as the plan Hannah and Roy had agreed upon dictated, Art Z. called Hannah between 11:30 and noon, informed her that the accommodation plan was not working, and told her they would need to develop a new accommodation plan. [Dkt. No. 164] at 225:25-226:7. She and Art planned to meet on April 9, 2015 to discuss alternative plans.

On April 2, 2015, Kelly G., who was the director of Hannah's component within ODNI, called a meeting to discuss the issues that Hannah had been having with attendance and reporting. The participants at that meeting were Kelly G., Art Z., the chief of staff of Hannah's component (Rebecca L.), ODNI's Employee-Management Relations Officer (Wayne S.), the head of ODNI's EEO and Diversity Office (Rita S.), and the head of ODNI's Human Resources Division (Sherry V.). [Dkt. No. 163] at 151: 3-9; [Dkt. No. 154] at ¶ 35. Both Kelly G. and Art. Z. were aware that Hannah's behavior was at least partially related to her depression. [Dkt. No. 163] at 148:3-10; 111:16-19. Nevertheless, Kelly G. testified that "there were really only two options on the table to address Hannah's late reporting," with one being "the disciplinary track"

6

and the other being a referral to the Employee Assistance Program ("EAP"), an employee counseling service offered to employees of the CIA and ODNI. The group settled on referring Hannah to the EAP. [Dkt. No. 163] at 152:2-154:6. Although Kelly G. testified that she chose the meeting's participants because they were "the experts" in ODNI's HR policies and could advise her about how to approach Hannah's "potential mental health condition," none of the assembled experts mentioned or considered the FMLA or ODNI's FMLA policy during this meeting. In fact, both Kelly G. and Art Z.—the only participants in the April 2 meeting who testified at trial—said that they did not know that ODNI had an FMLA policy in 2015. Id. at 114:7-19; 174:20-23.[4]

In preparation for her April 9, 2015 meeting with Art Z., Hannah met with both her psychiatrist and her counselor to discuss what course of action they would recommend for her going forward. [Dkt. No. 164] 227:3-20. They agreed that she should take four to six weeks of leave to get her depression symptoms under control. Based on this advice, Hannah decided to ask her supervisors to allow her to take four weeks of leave immediately, because it would allow her to get the relief she needed and return to the office before her team's busiest season began in late May. Id. According to Hannah, she discussed her plan to ask for four weeks of leave to treat her depression with Roy on April 7 or 8, and he told her that Art would have to approve any request for leave because he was already "involved" with the issue. Id. at 229:5-23. Although Roy testified that he remembered Hannah asking for four weeks of leave in early April "so she could get to a better place emotionally," he did not remember her specifically mentioning her depression at that time. Id. at 40:23-41:21. Roy admitted that he did not mention the availability of FMLA leave to Hannah during that conversation.

_____

[4] At the time, ODNI used the CIA's FMLA policy. [Dkt. No. 164] at 126:16-23.

When Hannah met with Art Z. and Kelly G. on April 9, 2015, she understood the meeting to be an opportunity to propose a new plan to deal with her attendance issues, and testified that she requested four weeks of leave "to start as soon as possible," meaning within a day or day and a half to enable her to finish up outstanding assignments. [Dkt. No. 164] at 232: 9-21. According to Art Z., Hannah informed him that her "physician recommended that she needed four weeks of leave," but he also testified that she did not say when exactly she wanted it to begin. [Dkt. No. 163] at 92:25-93:2, 115:16-18. Kelly G.'s understanding was that Hannah was looking for her leave to begin "as soon as we could." Id. at 159:14-16. Instead of granting Hannah's leave request, Art Z. and Kelly G. presented Hannah with the EAP referral and explained to her that her attendance at a counseling session the next day, April 10, was mandatory. [Dkt. No. 164] at 232:6-233:6; Def. Ex. 22. As Kelly G. testified, "We deferred her taking leave until she met with the EAP counselor." [Dkt. No. 163] at 159:8-9. Neither Art Z. nor Kelly G. mentioned FMLA leave to Hannah during the April 9 meeting. [Dkt. No. 164] at 235:24-236:2.

Hannah attended the April 10, 2020 session with the EAP counselor as directed. During the meeting, she asked the counselor what she needed to do to be able to go on leave, but her EAP counselor denied any ability to approve leave requests, telling Hannah that such decisions were up to management. [Dkt. No. 164] at 234:20-21. After meeting with Hannah, the EAP counselor reported to Art Z. that the EAP did not approve leave requests. Art Z. then went back to Hannah on April 13, 2015 and told her that they could move forward on her request for leave. In Art Z.'s own words, he was "heavily emphasizing that it would be annual leave," because that was the only kind of leave he believed he could authorize. [Dkt. No. 163] at 94:24-95:13. He did not recall limiting how many weeks of leave Hannah could take during this conversation, id. at 95:14-19; however, Hannah testified that he told her that he could only approve two weeks of

8

leave without approval from the Office of Medical Services. Although Hannah offered to submit to a fitness-for-duty medical exam, Art Z. told her that the Office of Medical Services would not be able to conduct such an evaluation because Hannah was a term-limited employee. [Dkt. No. 164] at 236:14-24. According to Hannah, they "went back and forth at least a couple times," with her telling Art Z. that she needed four weeks of leave, and Art Z. telling her that she could only take two weeks of leave. Id. at 237:9-14. Eventually, she "just said that the request was on hold so that [she] could get out of there." Id. at 279:9-12. Art Z. did not mention the FMLA to Hannah during their April 13 conversation about her leave request.

Hannah admitted that after April 13, 2020, she "just spiraled downwards," and her attendance "was a complete unmitigated disaster." [Dkt. No. 164] at 241:10-11; see Pl. Ex. 41-59. Later in April, she reiterated to Roy P. that she needed to take leave to treat her depression, and on his recommendation she sent an email on April 21, 2015 requesting another meeting with Art Z. and Kelly G. [Dkt. No. 164] at 244-45; Pl. Ex. 25. The meeting was scheduled for April 24 but was rescheduled a number of times over the course of the week, during which Hannah's symptoms became progressively worse. Id. During this same period of time, Kelly G. sent Art Z. an email, discussing their options with respect to Hannah, in which Kelly G. wrote that "pending any contrary information that EAP might provide based on their discussions with Hannah's care providers, we would be willing to grant Hannah 2-4 weeks of annual leave **if** she requested it." Def. Ex. 37 (emphasis in original).

On April 28, in an unscheduled meeting, Hannah told Kelly G. that she "desperately needed to go on leave and [she] was having trouble getting on [Kelly G.'s] calendar to get that request straightened out." [Dkt. No. 164] at 246:1-5. Kelly G. agreed that she would approve the leave request—for annual leave—on the condition that Hannah meet again with EAP and sign a

letter of expectations with Art Z. and Roy P. to lay out the schedule she would need to follow when she returned. Id. at 246:7-13. Kelly G. conceded that she required Hannah to meet with EAP again before beginning her leave, but denied that she conditioned Hannah's leave request on Hannah signing a letter of expectation before departing. [Dkt. No. 163] at 183:11-23.

It is undisputed that Hannah's leave request was finally approved as of May 5, 2015. [Dkt. No. 153] at ¶ 7. Hannah started her leave on May 5 and returned to work on May 29, during which time she used 110 hours of annual leave and 32 hours of sick leave. Id. It is also uncontested that no one from ODNI mentioned the FMLA to Hannah before she went on leave. Id. at ¶ 8. The weeks on leave clearly helped Hannah because after returning to work on June 1, 2015, her attendance was "nearly flawless," and her performance was exemplary. [Dkt. No. 164] at 27:23-28:7, 249:14-16.

Throughout 2015, Hannah was in the process of trying to secure permanent employment at ODNI, in anticipation of her term-limited position ending in March of 2016. According to Hannah, she actually started looking for a permanent position almost as soon as she started at ODNI; however, because of the confluence of a hiring freeze, a sequestration, and various budget cuts, the first meaningful opportunity she had to apply for positions was in late 2014 and early 2015. [Dkt. No. 164] at 215:15-216:11. At that time, she applied for two positions with the National Counterintelligence and Security Center (an organization within ODNI), but she was not selected for an interview. In the spring of 2015, shortly before she went on leave, Hannah applied for a permanent position at ODNI referred to as the Program Mission Manager, Cyber ("Cyber position"), for which she interviewed in June of 2015. [Dkt. No. 164] at 249:17-25. The interview panel unanimously recommended Hannah for the position. Id. at 250:8-10. Their recommendation was made to Mark Ewing ("Ewing"), who as the Chief Management Officer of

ODNI from 2011 until 2017, was "involved in approving all hiring actions" at the agency and was "the hiring authority" with respect to the Cyber position. Id. at 92:3-93:3.

Ewing testified that he had been aware of Hannah's attendance problems beginning in "probably January or February" of 2015, through reports from Kelly G. and from the Employment-Relations Management Officer Wayne S.; however, he was not involved in any decisions about how to handle those problems. [Dkt. No. 164] at 97:25-99:4. During the hiring process for the Cyber position, Ewing discussed Hannah's performance issues in more detail with Wayne S. and Art Z. Id. at 99:16-17. Based on these conversations, on June 30, 2015, Ewing sent an email to Stephanie O'Sullivan ("O'Sullivan"), the Principal Deputy Director for National Intelligence ("PDDNI"), to whom Ewing reported. Def. Ex. 52. O'Sullivan first became aware of Hannah from occasions when Hannah's team would brief senior staff on their projects. From these interactions, O'Sullivan considered Hannah to be "a terrific employee who did great work," and she testified that Hannah's name frequently came up when senior staff was considering which employees might be good fits for permanent positions within ODNI. [Dkt. No. 163] at 33:13-20, 34:19-35:3.

In his June 30 email to O'Sullivan, Ewing related his understanding of Hannah's attendance problems and her supervisors' efforts to address her "increasingly erratic" schedule in early 2015, including her referral to EAP. Def. Ex. 52. According to Ewing, he was "informed that EAP concluded [that Hannah] does not have a medical problem, rather she is a disciplinary problem." Id. He therefore concluded:

> We have had a consistent history of issues with [Hannah] over many months, despite some apparently solid performance while on the Snowden project. She has approached permanent employment as an entitlement. Her recent attendance issues suggest she is more than a disciplinary problem. [Her component supervisors] did not document her issues in the early part of her attendance problems. Wayne S.

11

applied pressure on Kelly and Art Z. to do so and they did take correct actions in the end.

Now we are getting questions about expediting her employment action from DDII.

Given this knowledge, I am concerned about hiring her. People are aware of her recent actions and watching what we do.

My recommendation is that we do not hire her at this time. Her recent performance is not consistent with a potentially good employee. However, I defer to your preference and this discussion is solely between you and me. I seek your guidance as to whether or not she should be offered permanent employment.

Id.

O'Sullivan testified that after she received Ewing's email, she "walk[ed] over to talk to him about what he had written about Hannah, largely to figure out[,] are we pas[t] the absence issue and what's the next step." [Dkt. No. 163] at 36:12-16. O'Sullivan testified that her goal during that conversation was to determine "how long would [Hannah] need to be back at work before we could say that the issue was resolved." Id. at 36:20-23. According to O'Sullivan, she left the conversation under the impression that Ewing was going to find out whether the absence issue had been resolved, and if so, they could move forward with hiring Hannah in accordance with the interview panel's recommendation; however, O'Sullivan also testified that she did not remember ever hearing from Ewing again on the issue. Id. at 37:6-20. O'Sullivan further testified that she would have been confident that Hannah's attendance issues were resolved if Hannah had 2-4 weeks back at work without any attendance problems. When asked if two months would have been a reasonable timeframe to assess Hannah's improvement, she responded that "two months seems a little long." Id. at 39:21-23, 40:21-23.

Although there is no evidence in the record that either O'Sullivan or DNI Clapper disapproved hiring Hannah for the Cyber position, id. at 38-39, Ewing sent an inaccurate email on July 13, 2015 to the directors of Hannah's component within ODNI reporting that she was

12

"not approved for permanent hire (by both the DNI and PDDNI) given her recent performance."

Pl. Ex. 10. He went on to explain:

> Therefore, she continues in her term appointment status with [her component]. It is
> important that you formally document her performance as we move forward …
> good and bad. If she continues to commit infractions, you need to document them
> and what guidance you provide her. All this should be in written form and retained
> as official records. Like all other employees, she may continue to apply for
> openings, but please do not suggest an outcome.

Id. Even though Ewing did not send this email until July 13, he testified at trial that he had
already made up his mind not to hire Hannah as of June 30 or July 1. [Dkt. No. 164] at 95:3-4.

In early June of 2015, Hannah applied for another position with ODNI, and she was
called in for an interview after she was rejected for the Cyber position. She testified that she did
not go to the interview because she was "encouraged by Kelly G. to withdraw [her] name from
contention for that position" given that Ewing "would also likely reject [her] for the second
position," which "could get embarrassing." [Dkt. No. 164] at 251:6-25.

Before June of 2015 Hannah's supervisors had encouraged her to seek various positions
at ODNI, but after July of 2015 none of them suggested that she apply for another position. Id. at
252:8-13. Although she felt her chances of getting another position in ODNI at that point were
"nil," she continued to reach out to former supervisors to discuss possible opportunities. She sent
her resume to one former supervisor who had moved to another office within ODNI and another
who had moved to the private sector, but neither followed up with her about possible
employment leads. Id. at 252:17-253:9. Hannah applied for 27 government jobs during the spring
and early summer of 2016, but she was not offered an interview for any of them. Id. at 255:1-15;
Pl. Ex. 74. She did not seek any employment in the private sector. Id.

On March 27, 2016, her five-year appointment ended. Her last effort to seek employment
in the intelligence field was August 2016. Id. After receiving no interviews, Hannah changed

career paths, studied for a real estate license, which she received in October 2016, and spent the rest of the year building a client base and searching for a brokerage firm with which to affiliate. [Dkt. No. 153] at ¶ 1; [Dkt. No. 164] at 256:20-257:7. She closed her first real estate sale in June of 2017. Id. at 257:11-17. During the bench trial Hannah explained that in the past year her business had "picked up quite a bit," and she was "doing pretty well." Id. at 257:22-258:1. For example, in 2018, Hannah earned nearly $40,000 in wages, and nearly $20,000 in business profits; by 2020, that amount had grown to more than $60,000 in wages and over $40,000 in business profits. [Dkt. No. 153] at ¶ 14. In this lawsuit, plaintiff seeks the following relief:

> For back pay [for the Cyber position] plus interest, Hannah seeks $675,359.97, along with lost leave plus interest of $13,085.27, totaling $688,445.24. These amounts should be doubled as liquidated damages, making a total monetary award for back pay and lost leave of $1,376,890.49. Hannah also seeks equitable relief in the form of employment/reinstatement plus one year of front pay, or (if reinstatement is not awarded) three years of front pay totaling $204,777.50. Hannah also seeks an Order requiring Defendant to (a) destroy all records of Plaintiff's depression, referral to EAP, Letter of Expectations and resulting review, and (b) only if reinstatement is ordered, comply with all FMLA requirements and implement appropriate workforce training.[5]

[Dkt. No. 166] at 1-2. For the reasons that follow, Hannah's award will be limited to the value of lost annual leave, doubled under the FMLA liquidated damages provision, with interest.

## II. CONCLUSIONS OF LAW

### A. <u>Liability</u>

As the Court ruled from the bench at the conclusion of the evidence, there is no question that the defendant interfered with plaintiff's FMLA rights. The FMLA "entitles eligible employees to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons." Rhoads v. FDIC, 257 F.3d 373, 381-82 (4th Cir. 2001). The FMLA

---

[5] These numbers were calculated at the time of briefing and therefore do not account for additional interest accrued since that time.

covers leave taken "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," including chronic serious health conditions like depression. 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.115(c). Although the employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave, … the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c). "After the employee makes such a statement, the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave." Dotson v. Pfizer, Inc., 558 F.3d 284, 295 (4th Cir. 2009). To succeed on a FMLA interference claim, an employee must show that she was prejudiced by the employer's failure to provide notice of the employee's FMLA rights. Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 302 (4th Cir. 2016).

Defendant has conceded that plaintiff was an eligible employee under the meaning of the FMLA, and that ODNI was a covered employer. [Dkt. No. 153] at ¶¶ 3-4; 29 U.S.C. § 2611. Defendant also does not contest the finding that neither of plaintiff's supervisors, nor any of defendant's HR personnel, provided plaintiff with any notice about her right to take leave under the FMLA. [Dkt. No. 153] at ¶ 8. Instead, defendant has argued that there was no FMLA violation because plaintiff's leave requests were "not sufficient to provide her supervisors notice that they should inquire whether her leave might be protected by the FMLA," and because plaintiff "cannot show she was prejudiced by the alleged FMLA interference." [Dkt. No. 154] at ¶¶ 132, 137. Neither argument is successful in light of the evidence presented at trial.

The Fourth Circuit has held that "disclosure of a potentially FMLA-qualifying circumstance and an inquiry into leave options is sufficient" to support a finding that the

15

employee "triggered her employer's FMLA obligations." Hannah P., 916 F.3d at 346; see also

Dotson, 558 F.3d at 291, 295 (finding that there was "no question" that an employee adopting a

child gave adequate notice of his need for FMLA leave when he "spoke with [a human resources

representative] about taking leave during the adoption process"). Plaintiff first requested leave at

her April 9, 2015 meeting with Art Z. and Kelly G. Both Art Z. and Kelly G. testified that before

that meeting, they were aware that Hannah suffered from a mental health condition that was

likely contributing to her attendance problems. See [Dkt. No. 163] at 148:3-10 (Kelly G.

testifying that plaintiff first informed her about a mental health condition in 2011); id. at 111:16-

19 (Art Z. testifying that "[o]n April 2, clearly, [he] was aware that she had depression because

it's in the discussion [he was] having with the Employee Assistance Program"). Art Z. also

testified that at the April 9 meeting, plaintiff told him that the four weeks of leave she was

requesting were recommended by her physicians, and Kelly G. testified that plaintiff asked for

her leave to begin as soon as possible. Id. at 115:16-18; 159:14-16. This testimony from

plaintiff's supervisors is consistent with Hannah's testimony that she requested four weeks of

leave "to start as soon as possible," to treat her depression as recommended by her psychiatrist

and her therapist. [Dkt. No. 164] at 232:9-21. This testimony establishes that plaintiff gave

defendant sufficient notice that she was requesting leave to treat a serious medical condition,

which is all that is required to trigger the defendant's obligations under the FMLA. 29 C.F.R.

§ 825.302(c). To accept defendant's argument to the contrary "would allow it to use its own

failure to determine whether leave should be designated as FMLA-protected to block liability"

for violations of the statute—an outcome that the Fourth Circuit has rejected. Dotson, 558 F.3d at

295.

16

The evidence also establishes that plaintiff was prejudiced by defendant's failure to provide her notice of her right to take sick leave under the FMLA. Although plaintiff had accrued more than four weeks of sick leave, she instead had to use 110 hours of her annual leave, based on her understanding that she would not be permitted to take sick leave. [Dkt. No. 164] at 247:8-17; see also [Dkt. No. 163] at 94:24-95:13 (Art Z. testifying that he "heavily emphasiz[ed]" that plaintiff would have to take annual leave, because he thought he could not authorize her to take sick leave).

The distinction between annual and sick leave is significant for a federal employee like plaintiff, because any unused annual leave would have been paid to her at her hourly rate of pay when she left federal employment. [Dkt. No. 153] at ¶¶ 9-11. There is no dispute that the 110 hours of annual leave that plaintiff used between May 5 and May 29, 2015 had a value of $7,541.60 at Hannah's hourly rate. As the Fourth Circuit observed when reversing the grant of summary judgment on the interference claim, this "loss of a benefit" is enough to satisfy the FMLA's prejudice requirement. Hannah P., 916 F.3d at 347.

Accordingly, the evidence establishes that plaintiff put defendant on sufficient notice that she was requesting leave guaranteed by the FMLA and that defendant did not respond by making plaintiff aware of her FMLA rights and promptly allowing her to take leave. By failing to give plaintiff the statutorily required notice and by requiring her to use annual leave, the defendant is liable for FMLA interference.

**B. Damages**

When an employer has violated the FMLA, the wronged employee can recover "damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617. Plaintiff seeks the value of annual leave she took. She also seeks to recover sick leave that she took during the weeks after

she first put defendants on notice of her need for leave; back and front pay for the Cyber

Position, for which she claims she would have been selected had she taken leave when she first

requested it; and equitable relief.

1. Annual Leave

As discussed above, plaintiff is entitled to recover $7,541.60, which is the value of the

annual leave she was required to take.[6] She is also entitled to an additional $7,541.60 in

liquidated damages because the FMLA provides for liquidated damages in an amount equal to

other damages awarded. Unless the employer's violation of the statute "was in good faith and …

the employer had reasonable grounds for believing that the act or omission was not a violation"

of the Act, liquidated damages are mandatory. 29 U.S.C. § 2617(a)(1)(A)(iii). As defendant

conceded in its post-trial brief, "the testimony at trial showed that Plaintiff's supervisors were

not aware in April 2015 of ODNI's obligations under the FMLA." [Dkt. No. 165] at 3; [Dkt. No.

163] at ¶ 10. Such ignorance does not entitle defendant to a claim that it acted in good faith.

Therefore liquidated damages are appropriate.

2. Sick Leave

Plaintiff argues that her "lost sick leave in April is also compensable under the FMLA,"

because sick leave "is a 'form of compensation subject to valuation.'" [Dkt. No. 166] at 4

(quoting Dotson, 558 F.3d at 295). In Dotson, the Fourth Circuit held that even paid leave which

cannot be cashed out by an employee at the end of their employment is compensable under the

---

[6] Between May 5 and May 29, plaintiff used 110 hours of annual leave; however, the testimony at trial established that she had enough sick leave available to cover her entire leave period, and that she would have used it instead of her annual leave if she had known that she could. [Dkt. No. 164] at 247:6-17. Plaintiff's hourly pay rate between April and June 2015 was $68.56 per hour, giving the 110 hours of annual leave she took a value of $7,541.60.

FMLA, because a "day's paid vacation is not valueless; it is a tangible employment benefit providing full pay for a day when no work is performed." Id. at 297. Dotson indicates that in some cases, lost sick leave might be an appropriate measure of damages under the FMLA; however, this case does not qualify for that remedy. As defendant correctly argues, "because taking four weeks of sick leave during that period of time was the very outcome [p]laintiff claims she sought, the sick leave she actually used cannot logically be characterized as something that was 'denied or lost' within the meaning of 29 U.S.C. § 2617(a)(1)(A)(i)(I)." [Dkt. No. 165] at 4. Even if, as the evidence suggests, plaintiff would have needed to take less leave overall had she been permitted to take leave when she first requested it on April 9, the total amount of sick leave she would have taken would have been much higher. Between April 5 and May 29, 2015, plaintiff took 77 hours of sick leave. If she had used sick leave for the full four-week period that she requested, she would have needed to take 142 hours of sick leave. [Dkt. No. 153] at ¶¶ 5-7. The result is that because of defendant's FMLA interference, plaintiff actually used less sick leave than she would have otherwise; accordingly, she is not entitled to reimbursement for the sick leave that she did use. Because plaintiff did not "lose" any sick leave as a result of defendant's FMLA violation, she is not entitled to compensation for her use of sick leave.

   3.   The Cyber Position

   The largest component of plaintiff's damages claim involves her non-selection for the Cyber position. Plaintiff argues that she would have been selected for the Cyber position if not for defendant's interference with her FMLA rights, and that accordingly she is entitled to back pay and front pay based on the salary and benefits she would have received in that position. [Dkt. No. 166] at 5. Defendant replies that damages related to the Cyber position are unavailable as a matter of law, because they are consequential damages which cannot be awarded under the FMLA. [Dkt. No. 165] at 4-9. Defendant further argues that even if damages for the Cyber

position were available to plaintiff, she has not met her burden of proving proximate causation. Id. at 9-13. Moreover, by making limited efforts to apply for government positions in the intelligence field and failing to pursue any private sector positions that might mitigate her losses, plaintiff cannot reasonably recover the damages she requests.

The text of the FMLA explicitly allows recovery for "wages, salary, employment benefits, and other compensation denied or lost … by reason of" a defendant's interference. 27 U.S.C. § 2617(a)(1)(A)(i)(I); see also 20 C.F.R. § 825.300(e) ("An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered."). The losses must be direct; the Fourth Circuit does not allow consequential damages in FMLA cases, see Montgomery v. Maryland, 72 F. App'x 17, 19 (4th Cir. 2003) (holding that nominal and consequential damages are not available under the FMLA).

In this civil action, plaintiff alleges that she did not obtain the permanent Cyber position for which she was qualified because of defendant's FMLA violation, and as a result lost the wages and benefits that would have come with that position. As defendant correctly argues, these wages and benefits represent consequential damages, which the Fourth Circuit has defined as "'[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act.'" Trimed, Inc. v. Sherwood Med. Co., 977 F.2d 885, 893 n.7 (4th Cir. 1992) (quoting Black's Law Dictionary 390 (6th ed. 1990)). Plaintiff therefore cannot recover if there was an "intervening and superseding cause[]" that broke the chain of causation between defendant's interference and plaintiff's non-selection. See Grant Thornton, LLP v. FDIC, 435 F. App'x 188, 196-98 (4th Cir. 2011) (defining

intervening and superseding cause as one which is "significantly independent" from the initial wrong, such that they have "only a tangential relation to each other").

Plaintiff has not carried her burden of showing that defendant's FMLA interference proximately caused her non-selection for the Cyber position. As defendant correctly argues, plaintiff's "attendance issues after April 9, 2015"—the date on which she first requested leave— "were not 'the principal cause' of her non-selection for the Cyber position." [Dkt. No. 165] at 11. Rather, plaintiff's non-selection for the Cyber position was a result of many intervening factors, including plaintiff's attendance problems before April 9 and Chief Management Officer Ewing's poor impression of plaintiff as a prospective employee, which was significantly independent of the FMLA interference.

Even though Hannah was unanimously recommended for the Cyber position by the interview panel, [Dkt. No. 153] at ¶ 1, Ewing, the official with hiring authority for the position, rejected that recommendation. After testifying that his refusal to hire plaintiff was the only time during his twelve years at ODNI that he went against a unanimous interview panel's recommendation, he explained that he did so because of plaintiff's attendance issues, which he considered to be a disciplinary problem. [Dkt. No. 164] at 92:3; 106:12-17; 111:22-112:8. Plaintiff argues that Ewing's testimony proves that without defendant's interference, she would have had sufficient time to demonstrate positive attendance before Ewing made his hiring decision. Indeed, Ewing testified that if he had seen "some pattern of positive ... conduct after the 9th of April," then hiring plaintiff for the Cyber position "would have been a real possibility." [Dkt. No. 164] at 110:15-22. Plaintiff points to his statement to argue that if she had taken four weeks of leave as soon as possible after the April 9 meeting in which she first requested time off to treat her depression, she would have returned to work by early-to-mid-May

of 2015, rather than at the end of the month, giving Ewing a few more weeks to evaluate her attendance record. By all accounts, plaintiff had no further problems with attendance after taking leave. [Dkt. No. 164] at 27:23-28:7, 249:14-16. Additionally, because plaintiff would have had several fewer weeks of pre-leave attendance problems, her record would not have been as damaging in the first place. Id. at 241:10-242:15; Pl. Exs. 41-59 (showing plaintiff's attendance after April 9 "spiraled downward" due to her depression).

Although plaintiff's argument has some appeal, the evidence does not support plaintiff's conclusion. Ewing testified that he had fully made up his mind not to hire plaintiff by June 30. On the same day he reached out to O'Sullivan for her opinion about plaintiff. [Dkt. No. 164] at 95:3-4. Even though he had seen several years of Hannah's exemplary work record before her attendance problems in the winter and spring of 2015 and she had been back at work for nearly a month by that time, his email clearly reflected that he saw Hannah as a "disciplinary problem" with a "history of issues" who was approaching permanent hire as an "entitlement." Def. Ex. 52. Although his email emphasized that Hannah's attendance problem continued after she was referred to EAP on April 9, he also called her problems "consistent" for "several months." Id. His email included the statement that Hannah's "attendance and work and attitude" issues began in "mid-Jan[uary] 2015" and grew serious enough to warrant a management referral to EAP in April. Id. This time period predates when the FMLA interference occurred. Additionally, Ewing did not mention Hannah's perfect attendance record since returning from leave—he did not appear to even know that her attendance had improved at all. Id.

That Ewing saw Hannah as a "consistent" problem is further buttressed by an email he sent on July 13, 2015, in which he misrepresented that both Clapper and O'Sullivan disapproved hiring Hannah, even though there is no evidence in the record that either had made any decision

22

regarding Hannah. Pl. Ex. 10. In fact, O'Sullivan testified that once plaintiff's attendance issues were resolved, she "would have been delighted" to have Hannah join ODNI permanently. [Dkt. No. 163] at 44:1-3. It is clear that Ewing saw things differently. There is no evidence in the record showing that Ewing ever consulted O'Sullivan again to reevaluate Hannah's attendance. Id. at 37:15-23. Instead, the evidence shows that he unilaterally decided that Hannah should not be "approved for hire" and even went so far as to direct her supervisors in the July 13 email that if Hannah did apply for a permanent position at ODNI, they should "not suggest an outcome." Id. at 38:9-39:2; Pl. Ex. 10.

On this record, it would be too speculative to conclude that Ewing would have selected Hannah for the Cyber position if she had been allowed to take leave on April 9, because it appears that Ewing saw Hannah as a problematic employee based on her attendance before April and simply was not interested in hiring her thereafter. In fact, when Hannah had the opportunity to interview for another position in ODNI later in July, Kelly G. advised her to "withdraw [her] name from contention" because Ewing would "also likely reject [Hannah]" for that position and "it could get embarrassing." [Dkt. No. 164] at 251:16-25. Accordingly, the evidence establishes that the proximate cause of Hannah's non-selection for the Cyber position was Ewing's negative impression of Hannah based on her downward spiral which he described as starting in mid-January, and not the attendance issues caused by the few weeks of FMLA interference in April. For these reasons, her damage claims related to non-selection for the Cyber position fail.[7]

---

[7] Defendant also argues that even if plaintiff had shown that her loss of the Cyber position was a direct result of FMLA interference, she should not recover back pay for the Cyber position because she did not sufficiently mitigate her losses by applying for a sufficient number of other positions. Generally, a plaintiff's "[f]ailure to diligently seek new employment precludes an award of back pay for the period during which employment was not sought." Perry v. Isle of Wight County, 2017 WL 3446025, at *3 (E.D. Va. Aug. 10, 2017). In explaining the rationale for this policy, the Fourth Circuit has said that an employee wrongfully terminated under the

### 4. Equitable Relief

Finally, plaintiff requests two forms of equitable relief: (1) reinstatement, with an accompanying injunction regarding FMLA compliance and training at ODNI; and (2) the destruction of certain records in her personnel file related to the events at issue in this action. In addition to compensatory and liquidated damages, the FMLA provides for such "equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617 (a)(1)(B). See also 29 C.F.R. §825.400 (finding such relief available "if justified by the facts of a particular case"). Here, the Court does not find additional equitable relief to be "justified by the facts." Id.

Reinstatement was not specifically sought as relief in plaintiff's Amended Complaint [Dkt. No. 65], although it has been raised throughout this litigation. Regardless, it is not an appropriate remedy here. As plaintiff recognizes, "intervening historical circumstances can make [reinstatement] impossible or inappropriate." Duke v. Uniroyal, Inc., 928 F.2d 1413, 1423 (4th Cir. 1991). This is especially true when there is "continued hostility between the parties." Hunter v. Town of Mocksville, 897 F.3d 538, 562 (4th Cir. 2018). Plaintiff has not sought employment at ODNI or a similar employer in the intelligence community in over five years, see Pl. Ex. 74, she no longer has the required security clearance, [Dkt. No. 164] at 269:2-4, and she admits to having doubts about whether she would want to return to ODNI. See [Dkt. No. 166] at 18 ("Hannah would consider reinstatement **but only if ODNI would welcome it**") (emphasis in original). Specifically, plaintiff suggests that any opposition at all in the defense brief would

---

FMLA "may not remain idle and recover lost wages from the date of discharge. The employee must make a reasonable effort to find other suitable employment." Edwards v. Sch. Bd. Cty. Norton, Va., 658 F.2d 951, 956 (4th Cir. 1981). Plaintiff's failure to mitigate would have resulted in a significant reduction of any back pay award, but the issue need not be further addressed because she has not prevailed on this damage claim.

mean that reinstatement should be off the table. Id. Defendant's brief does oppose reinstatement. [Dkt. No. 165] at 18. For these reasons, reinstatement is not appropriate.

Plaintiff also requests an injunction requiring ODNI to observe various FMLA requirements or require various training programs to ensure that future ODNI employees do not go through the same experience. This request also fails, because without reinstatement plaintiff has no potential or prospective employment at ODNI and therefore does not have proper standing to request this relief, as she is unlikely to be impacted by ODNI's leave practices in the future. Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991) ("The injunctive and declaratory powers of the federal courts are broad and vital to justice, but Article III simply precludes their empty use to enjoin the conjectural[.]"). Plaintiff concedes this point.

Plaintiff's last request is that various records in her personnel file relating to the events of this action be destroyed. Specifically, she asks for the expungement of:

> (a) the entire EAP file created by the EAP counselor, (b)...any documents created or related to EAP, or mentioning depression, including the April 9th referral to EAP, Def. Ex. 22; the May 3 2015 Letter of Expectations (Def. Ex. 45) plus subsequent linked progress reports; and Mark Ewing's June 30th and July 13th emails (Def. Exs. 52 and 56)

[Dkt. No. 166] at 19. Plaintiff argues that these records were created "because of [d]efendant's refusal to grant Hannah's early April FMLA leave request" and therefore their destruction would help put her back into the position she would have been if there had been no violation. Id. Plaintiff cites to a recent case in this circuit in which similar relief was awarded. Wootten v. Virginia, No. 6:14-cv-00013, 2016 WL 7496145 at *5 (W.D. Va. Dec. 30, 2016) (ordering expungement of two wrongfully created citations in a personnel file, and the insertion of the court's ruling in the employee's file). Defendant replies, first, that these records do not seem to exist, and even if they did that the intelligence community has a "legitimate interest in ensuring the mental stability of its employees." [Dkt. No. 165] at 20.

Testimony at trial suggested that the records about which plaintiff is concerned were not kept. [Dkt. No. 163] at 104:22-105:5. Defendant's brief, while not a declaration or evidence, reiterates this:

> ODNI has informed undersigned counsel that it has searched for a component file for Plaintiff within the internal files of the Requirements, Cost, and Effectiveness (the successor entity to the Systems, Resource and Research Analysis unit in which Plaintiff worked) and did not locate one. In addition, ODNI represents that it has reviewed Plaintiff's 28-page Official Personnel Folder ("OPF") and found no mention of the term "depression," nor did it find any documents in Plaintiff's OPF that reference her attendance and reporting issues from 2015.

[Dkt. No. 165] at 20. The Court therefore declines to issue any equitable relief regarding plaintiff's personnel file as there is no evidence that the information at issue is in the file.

Although plaintiff has not obtained the monetary and injunctive relief she sought in this civil action, she has certainly alerted ODNI to its gross failure to comply with the FMLA. As the Court previously observed, the government, and in particular the intelligence community, lost a valuable employee because it did not have an effective human resources office which could have identified plaintiff's mental health needs and worked with her in a proactive way:

> From the government's side, … [y]ou lost a really valuable person, and I don't know why there wasn't more effort made. If everybody was truthful about thinking so much about her, why they would not have tried to help her more get another position. I'm not satisfied that [the effort to get plaintiff a permanent position] was done with as much good faith as it should have been done.

[Dkt. No. 163] at 214:3-11. It is essential to the functioning of our nation's government that talented individuals who commit themselves to civil service with competence and intelligence be valued, well-treated, and retained. Government agencies like defendant must take measures to improve their practices to avoid the loss of future employees like plaintiff.

## III. CONCLUSION

For the reasons stated above, a judgment in the amount of plaintiff's lost annual leave, doubled under the liquidated damages provision of the FMLA, with pre- and post-judgment interest, will be entered in plaintiff's favor on her claim of FMLA interference by an appropriate order to be issued with this Memorandum Opinion. The order will direct the parties to calculate the appropriate amount of pre-judgment interest and work towards resolving an appropriate award of attorney's fees and expenses for plaintiff's counsel. If they are unable to agree on the amount, a briefing schedule will be set.

Entered this _30_ day of December, 2021.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge